1
2
3
4                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
5                               AT TACOMA

6    ANGELA D. HURN,
                                              Case No. 3:17-cv-00884-TLF
7                          Plaintiff,
                                              ORDER AFFIRMING
8          v.                                 DEFENDANT'S DECISION TO
                                              DENY BENEFITS
9    NANCY A. BERRYHILL, Deputy
     Commissioner of Social Security
10   Operations,

11                         Defendant.

12         Angela D. Hurn has brought this matter for judicial review of defendant's denial of her

13   applications for disability insurance and supplemental security income (SSI) benefits. The parties

14   have consented to have this matter heard by the undersigned Magistrate Judge. 28 U.S.C. §

15   636(c), Federal Rule of Civil Procedure 73; Local Rule MJR 13. For the reasons set forth below,

16   the undersigned affirms defendant's decision to deny benefits.

17                    FACTUAL AND PROCEDURAL HISTORY

18         On September 12, 2012, plaintiff filed an application for disability insurance benefits.

19   Dkt. 8, Administrative Record (AR) 16. She filed an application for SSI benefits one week later.

20   *Id.* She alleged in both applications that she became disabled beginning December 31, 2005. *Id.*

21   These applications were denied by the Social Security Administration on February 5, 2013, and

22   reconsideration was denied on May 23, 2013. AR 16, 133. A hearing was held before an

23   administrative law judge ("ALJ"), at which plaintiff appeared and testified, as did a vocational

24   expert. AR 16.

25

The ALJ found in a decision on January 28, 2016, that Ms. Hurn could perform some jobs existing in significant numbers in the national economy and therefore that she was not disabled. AR 36. Ms. Hurn's request for review was denied by the Appeals Council on April 5, 2017, making the ALJ's decision the final decision of the Commissioner. AR 1. Ms. Hurn appealed to this Court on July 12, 2017. Dkt. 4; 20 C.F.R. §§ 404.981, 416.1481.

The ALJ resolved steps one and two of the five-step analysis in Ms. Hurn's favor. AR 23. The ALJ found that Ms. Hurn had not engaged in substantial gainful activity since the alleged onset of her disability and that she had the following severe impairments: spine disorder, dysfunction of major joints, obesity, affective disorders, anxiety disorders, and substance addiction disorders. AR 19. At step three, the ALJ found that Ms. Hurn does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. AR 20.

In assessing the plaintiff's residual functional capacity (RFC), the ALJ found that she had the residual functional capacity

> **to perform light work as defined in 20 CFR 404.1567(b) and 419.967(b) except stand and/or walk for a total of four hours in an eight hour workday; sit for a total of eight hours in an eight hour workday; occasionally climb ramps and scaffolds, but never ropes, ladders, or scaffolds;[1] occasionally balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to vibration and hazards such as dangerous machinery, unprotected heights, etc. Additionally, capable of unskilled, simple, repetitive, and routine tasks with customary breaks and lunch; low stress environment defined as only occasional decision-making needed; no more than frequent changes in the work environment; frequent contact with co-workers for work tasks, but the majority of work tasks should not require collaborative efforts and the average occurrence should be 30 minutes or less; occasional contact with the general public, with the average occurrence involving 15 minutes or less, but incidental contact is not precluded; and off task up to 5% of the eight hour workday.**

---

[1] Ms. Hurn does not challenge the RFC's apparent self-contradiction regarding her ability to climb scaffolds.

AR 21 (emphasis in original). Using this assessment of the plaintiff's RFC, the ALJ found at step five that Ms. Hurn was not disabled; the ALJ determined there were a number of jobs that exist in significant numbers in the national economy that Ms. Hurn could perform.

Ms. Hurn seeks reversal of the ALJ's decision and remand for further proceedings including a new hearing. She alleges that the ALJ erred:

(1)     in failing to fully and fairly develop the record;

(2)     in evaluating the medical evidence;

(3)     in discounting Ms. Hurn's credibility;

(4)     in discounting the testimony of three lay witnesses;

(5)     in assessing Ms. Hurn's residual functional capacity; and

(6)     in finding Ms. Hurn could perform other jobs existing in significant numbers in the national economy.

For the reasons set forth below, the Court finds that the ALJ's decision should be affirmed.

<u>DISCUSSION</u>

The Court will uphold an ALJ's decision unless: (1) the decision is based on legal error; or (2) the decision is not supported by substantial evidence. *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). This requires "'more than a mere scintilla,'" though "'less than a preponderance'" of the evidence. *Id.* (quoting *Desrosiers*, 846 F.2d at 576).

The Court must consider the administrative record as a whole. *Garrison v. Colvin,* 759 F.3d 995, 1009 (9th Cir. 2014). The Court is required to weigh both the evidence that supports,

and evidence that does not support, the ALJ's conclusion. *Id.* The Court may not affirm the decision of the ALJ for a reason upon which the ALJ did not rely. *Id.* Only the reasons identified by the ALJ are considered in the scope of the Court's review. *Id.*

"If the evidence admits of more than one rational interpretation," that decision must be upheld. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). That is, "[w]here there is conflicting evidence sufficient to support either outcome," the Court "must affirm the decision actually made." *Allen*, 749 F.2d at 579 (quoting *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

A.    The ALJ's Duty to Develop the Record

First, Ms. Hurn asserts that the ALJ failed to fully and fairly develop the record.

Disability hearings are non-adversarial. *DeLorme v. Sullivan*, 924 F.3d 841, 849 (9th Cir. 1991). An ALJ has "an independent duty to fully and fairly develop the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir 2001) (internal quotation marks omitted). This is particularly important when the claimant has mental impairments, even when the claimant is represented by counsel. *DeLorme*, 924 F.3d at 849. A person with mental impairments may have extreme difficulty protecting the person's own interests, recalling treatment history, and complying with procedural rules. *Id.* Where evidence is ambiguous or the ALJ finds the record inadequate, the ALJ must "'conduct an appropriate inquiry.'" *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). The ALJ can do this "in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Id.* (emphasis added).

Ms. Hurn asserts that "there appeared to be over five hundred pages of missing medical records from Providence Medical Center." Dkt. 13, p. 3. She bases this assertion on the page counts on invoices her attorneys stated they received from that hospital during administrative

proceedings. *See* AR 71-74, 510-11, 513, 515, 518. She does not point to evidence that these records exist or speculate about what they might contain. She does not contend that any evidence in the record is ambiguous. *See* Dkt. 13, p. 6-8. Nor does she assert that the existing record is inadequate. Thus, the ALJ's duty to conduct an inquiry was not triggered. *See Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001) (citing *Tonapetyan*, 242 F.3d at 1150). Accordingly, the ALJ did not err with respect to fully and fairly developing the record.

B.     The ALJ's Evaluation of the Medical Opinion Evidence

Ms. Hurn asserts that the ALJ failed to provide specific and legitimate reasons in discrediting the opinions of several treating and examining physicians and psychologists. Specifically, Ms. Hurn claims that the ALJ did not give sufficient weight to the opinions of Timothy R. Johnson, M.D., Margaret L. Cunningham, Ph.D., Jason Prinster, Ph.D., Aaron Burdge, Ph.D., Benjamin Aleshire, Ph.D., or to observations and diagnoses by Kent T. Ta, M.D., and James Patrick Robinson, M.D.

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Where the evidence is inconclusive, "questions of credibility and resolution of conflicts are functions solely of the [ALJ]." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). In such situations, "the ALJ's conclusion must be upheld." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" medical opinions "falls within this responsibility." *Id.* at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." *Reddick*, 157 F.3d at 722. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

stating his interpretation thereof, and making findings." *Id.* at 725. The ALJ also may draw

inferences "logically flowing from the evidence." *Sample*, 694 F.2d at 642. Further, the Court

may draw "specific and legitimate inferences from the ALJ's opinion." *Magallanes v. Bowen*,

881 F.2d 747, 755 (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted

opinion of either a treating or examining physician. *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th

Cir. 2017) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). Even

when a treating or examining physician's opinion is contradicted, an ALJ may only reject that

opinion "by providing specific and legitimate reasons that are supported by substantial

evidence." *Id.*

However, the ALJ "need not discuss *all* evidence presented" to him or her. *Vincent on

Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (citation omitted)

(emphasis in original). The ALJ must only explain why "significant probative evidence has been

rejected." *Id.* Essentially, "an ALJ errs when he rejects a medical opinion or assigns it little

weight while doing nothing more than ignoring it, asserting without an explanation that another

medical opinion is more persuasive, or criticizing it with boiler plate language that fails to offer a

substantive basis for his conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1012-1013 (9th Cir.

2014).

In general, more weight is given to a treating physician's opinion than to the opinions of

those who do not treat the claimant. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). On

the other hand, an ALJ need not accept the opinion of a treating physician if that opinion is brief,

conclusory, and inadequately supported by medical findings or by the record as a whole. *Batson

v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). An examining physician's

opinion is "entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." *Id.* at 830-31.

1. Treating Physician Timothy R. Johnson, M.D.

Ms. Hurn contends that the ALJ failed to give proper weight to the opinion of Dr. Johnson, her treating physician beginning in February 2008. AR 537.

Dr. Johnson completed either two or three forms offering his opinion on Ms. Hurn's ability to work. He wrote in January 2011 that Ms. Hurn suffers from "depression/anxiety with agoraphobia," post-traumatic stress disorder (PTSD), and "chronic pain/fibromyalgia." AR 524. He wrote that these diagnoses are supported by "clinical diagnosis." *Id.*

He marked that these conditions limit Ms. Hurn's ability to work; asked to describe the specific limitations, he wrote "Diffuse body pain/fatigue." *Id.* He did not mark the number of hours per week, from 0 to 40, that Ms. Hurn could work. *Id.* He marked that the conditions would also limit Ms. Hurn's ability to prepare for and look for work; asked to describe this, he wrote "She has significant mental health issues." *Id.* He did not mark how many hours per week that Ms. Hurn *could* perform such activities. *Id.* He marked that Ms. Hurn had limitations in lifting and carrying and that she could perform sedentary work. *Id.* He marked that Ms. Hurn's conditions impact her ability to access services and explained, "She has trouble tracking time [and] transportation is a problem. Childcare problems as well." AR 525. He circled "Months" to indicate how long Ms. Hurn's conditions would limit her, but he did not write in a number of months. *Id.* He indicated that he did not make a specific treatment plan for Ms. Hurn other than prescribing medications. *Id.*

In October 2011, Dr. Johnson wrote that Ms. Hurn suffers from: "Depression/anxiety/insomnia," knee pain, and fibromyalgia. AR 521. He again indicated that

Ms. Hurn's conditions limit her ability to work, and in explanation he wrote "Physically [and] mentally unable to work." *Id.* On the same form he again indicated Ms. Hurn is capable of sedentary work. *Id.* He again did not mark the number of hours Ms. Hurn can work, 0-40, or how many hours she can spend preparing for and looking for work. *Id.* He again circled "Months" for the duration of Ms. Hurn's limitations without indicating a number of months, and he again indicated that he did not make a specific treatment plan for Ms. Hurn. AR 522. (In the space to describe how Ms. Hurn's conditions impact her ability to access services, it appears that Ms. Hurn wrote her own description. *See id.*)

The record contains one other form opinion that appears similar to the other two, and may or may not have been completed by Dr. Johnson—this form is unsigned and undated. AR 527-28.

The ALJ found Dr. Johnson's opinions not to be "persuasive." AR 32-33. He explained that (1) Dr. Johnson's October 2011 opinion was self-contradictory, as it indicated both that Ms. Hurn could not work at all and that she could perform sedentary work; (2) Dr. Johnson "cited to no findings or examinations to support these opinions, but merely listed diagnoses;" and (3) Dr. Johnson's notes indicate that he "was acting as an advocate, rather than rendering an objective opinion of the claimant's functionality." *Id.*

Ms. Hurn contends that these reasons were neither legitimate nor supported by substantial evidence, and that the ALJ failed to give "proper deference" to Dr. Johnson as her treating physician. Dkt. 13, p. 8.

This court need not address issues that a party does not argue with specificity in its briefing. *Carmickle v. Commissioner of Social Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008); *see Paladin Associates., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003)

(by failing to make argument in opening brief, objection to grant of summary judgment was waived); *Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) (matters not specifically and distinctly argued in opening brief ordinarily will not be considered). The Court is not convinced that Ms. Hurn adequately briefs her challenge to the ALJ's discussion of Dr. Johnson's opinion. Nonetheless, the Court will address Ms. Hurn's arguments on the merits as far as it can discern them.

ALJs must accord special attention to the opinions of treating doctors. The regulations require the ALJ evaluate any medical opinion based on a number of factors, including: 1) the examining relationship; 2) the treatment relationship; 3) supportability; 4) consistency and; 5) specialization. *See* 20 C.F.R. § 404.1527(c). More weight is given to opinions from treating sources, sources who have examined the claimant a number of times, and sources who have greater knowledge about the claimant's medical impairments. *See* 20 C.F.R. § 404.1527(c)(2)(i); *see Trevizo*, 871 F.3d at 676 ("[T]he ALJ erred by failing to apply the appropriate factors in determining the extent to which the opinion should be credited.").

The Court concludes that the ALJ adequately considered Dr. Johnson's treating opinions and offered specific, legitimate, and supported reasons to reject them.

First, the ALJ's finding that Dr. Johnson "cited to no findings or examinations to support [his] opinions, but merely listed diagnoses" was supported, and it constitutes a specific and legitimate reason to discount those opinions. As noted above, Dr. Johnson's opinions (1) consisted of check-boxes along with lists of diagnoses and brief and conclusory statements that Ms. Hurn is disabled; (2) lacked any supporting explanation or documentation, even when prompted to do so; (3) were incomplete, as Dr. Johnson did not specify hours per week that Ms. Hurn was capable of performing work functions, hours per week she was capable of preparing

and looking for work, or a duration for her limitations; and (4) directly contradicted themselves in stating that Ms. Hurn was both unable to work and able to perform sedentary work. *See* AR 521, 524; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must show medically determinable impairment that can be expected to result in death or has lasted or can be expected to last at least 12 months).

An ALJ may reject an opinion on the limiting effects of impairments when the opinion consists "primarily of a standardized, check-the-box form in which [the provider] failed to provide supporting reasoning or clinical findings, despite being instructed to do so." *Molina v. Astrue*, 674 F.3d 1104, 1111–12 (9th Cir. 2012); *see also Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (holding ALJ "permissibly reject[ ] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions."); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (noting "the regulations give more weight to opinions that are explained than to those that are not"). Under this standard, the ALJ validly rejected Dr. Johnson's opinions.

Second, the ALJ gave Dr. Johnson's opinions sufficient consideration as opinions of a treating physician. The Court must consider the record as a whole in determining whether the record supports the ALJ's conclusion that Dr. Johnson's findings are inconsistent with that record. *Garrison,* 759 F.3d at 1009-10. The Court finds that the ALJ's discussion as a whole "set[ ] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[ed] his] interpretation thereof, and ma[de] findings." *Magallanes*, 881 F.2d at 751. That the ALJ did not expressly do so in the portion of his discussion rejecting Dr. Johnson's opinions does not invalidate the analysis. "Even when an agency 'explains its decision with less than ideal clarity,' we must uphold it 'if the agency's path may reasonably be discerned.'" *Molina*, 674 F.3d at 1121

(quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004)) (internal quotation marks omitted).

In particular, the ALJ addressed Ms. Hurn's treatment history with Dr. Johnson as outlined in the regulations. *See* 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ considered the nature and length of the treatment relationship, observing that Ms. Hurn did not establish primary care until she saw Dr. Johnson in February 2008, over two years after the alleged onset of her disability. AR 23. The ALJ reviewed in depth the course of Ms. Hurn's treatment with Dr. Johnson. AR 23-27. And the ALJ considered the supportability of Dr. Johnson's opinions, as discussed above; the ALJ concluded that they were vague and offered "no findings or examinations to support" them. AR 32; *see* § 404.1527(c)(3).

Also the ALJ considered the consistency (or lack of consistency) of Dr. Johnson's opinions "with the record as a whole," finding that record to be "inconsistent with the extent of [Ms. Hurn's] alleged physical symptoms and limitations," which were reflected both in Ms. Hurn's testimony and the complaints relied on by Dr. Johnson. 20 C.F.R. § 404.1527(c)(4). In particular, the ALJ noted Dr. Johnson had observed that Ms. Hurn's pain lacked "an obvious etiology" or positive objective signs -- and her neurological symptoms were "vague," AR 23, 25; *see* AR 539. The ALJ noted that imaging of her cervical and lumbar spine showed "minimal" and "normal" findings, respectively, AR 23; *see* AR 622, 627. Most comprehensively, the ALJ recounted what he found to be Ms. Hurn's "persistent pursuit of medication," coupled with a failure to pursue other recommended treatment options. AR 23-27. As discussed below, substantial evidence supports those conclusions.

The ALJ thus gave sufficient consideration of Dr. Johnson's opinions as a treating physician. *See* § 404.1527(c); *Trevizo*, 871 F.3d at 676. His reasons for discounting Dr.

1  Johnson's opinions were specific and legitimate and the ALJ's reasons are supported by the

2  record. Accordingly, the Court does not need to consider whether the ALJ's additional reason—

3  that Dr. Johnson's notes show he "was acting as an advocate," rather than offering objective

4  opinions—was valid and supported. AR 32.

5        2.     <u>Examining Psychologist Margaret L. Cunningham, Ph.D.</u>

6        Ms. Hurn contends that the ALJ erred in giving "minimal weight" to Dr. Cunningham's

7  opinions regarding the limitations caused by Ms. Hurn's mental-health conditions.

8        Dr. Cunningham examined Ms. Hurn in November 2012 and October 2014. AR 1766,

9  1882. In 2012, Dr. Cunningham conducted a clinical interview, made clinical findings and

10  diagnoses, and conducted a mental status exam. AR 1766-78. She noted "serious" symptoms of

11  depression, anxiety, and panic disorder, and "moderate to severe" symptoms of PTSD, as well as

12  pressured and tangential speech, irritability, emotional lability, and distractibility. AR 1768,

13  1771-72. She also wrote that Ms. Hurn "said that she has never abused substances" or been "in

14  treatment for substance use." AR 1767. Dr. Cunningham did not review any medical records. AR

15  1766. She opined that Ms. Hurn would have severe or marked limitations in every area of social

16  and cognitive functioning. AR 1770.

17        Dr. Cunningham's October 2014 evaluation was similar. AR 1882-93. She again

18  conducted a clinical interview, made clinical findings and diagnoses, and performed a mental

19  status exam. *Id.* She did not review any medical records other than her prior evaluation.

20  Although she opined that Ms. Hurn would be only moderately impaired in three areas, she

21  opined as before that Ms. Hurn would be markedly too severely impaired in all other areas of

22  social and cognitive functioning. AR 1770, 1886.

As Ms. Hurn points out, the ALJ apparently confused the two opinions. Although the decision referred to Dr. Cunningham's "November 9, 2012" evaluation, the ALJ's decision actually discussed only the October 2014 evaluation. AR 34.

The ALJ offered several reasons for according "little weight" to Dr. Cunningham's October 2014 opinion: (1) Dr. Cunningham's opinions were based only on Ms. Hurn's self-reports—which the ALJ found unreliable—and Dr. Cunningham's own observation; (2) Ms. Hurn did not pursue mental health treatment other than medication, undermining her subjective allegations; (3) although Dr. Cunningham observed "some exaggeration" by Ms. Hurn, she did not indicate how she accounted for this in her opinion (the ALJ found this "particularly significant, as Dr. Cunningham did not appear to examine any medical records"); (4) Dr. Cunningham did not relate the limitations she found to any findings in her testing, or others' testing; and (5) Dr. Cunningham likely "had a false diagnostic picture," in that she apparently "was also unaware of the claimant's addiction to both narcotic medication and benzodiazepines." AR 34.

These were specific and legitimate reasons to discount Dr. Cunningham's opinion. Moreover, Ms. Hurn challenges only the first and the fifth reasons the ALJ gave; and with respect to the fifth, she based her arguments solely on conclusions. *See* Dkt. 13, pp. 6-7. Because the unchallenged reasons were sufficient to discount Dr. Cunningham's 2014 opinion, the ALJ did not err in giving less weight to the opinion of Dr. Cunningham. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir.2004) (ALJ's error is harmless if Court can conclude, in light of record-supported reasons, that error did not "affect[ ] the ALJ's conclusion").

As noted above, the ALJ apparently failed to consider the November 2012 evaluation. This was error under the Social Security Administration regulations. 20 C.F.R. § 404.1527(c) ("[W]e will evaluate every medical opinion we receive.").

However, the Court concludes that the ALJ's error in failing to address the November 2012 evaluation was harmless. "An error is harmless only if it is inconsequential to the ultimate nondisability determination, or if despite the legal error, the agency's path may reasonably be discerned." *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) (internal quotation marks and citations omitted). Because the ALJ properly addressed Dr. Cunningham's second opinion, and that opinion was substantially similar to her first, the ALJ's failure to address that opinion would not have changed the ultimate disability determination. *See Batson*, 359 F.3d at 1197.

3.    Reviewing Psychologist Aaron Burdge, Ph.D.

Next, Ms. Hurn challenges the ALJ's consideration of a "Review of Medical Evidence" form signed by Dr. Burdge.

Dr. Burdge completed the form in November 2012, having reviewed Dr. Cunningham's November 2012 evaluation. Dr. Burdge marked that Ms. Hurn's reported impairments were supported by medical evidence and listed symptoms that included "worthlessness, hopelessness, sleep disturbance, fatigue, no appetite and losing weight." AR 1881. He wrote that Ms. Hurn's "anxiety is fairly severe with daily panic attacks and PTSD symptoms." *Id.* He opined that because her symptoms cause "marked restriction of activities in daily living and marked difficulties in maintaining social functioning," he could "state to a reasonable medical certainty that the Claimant will qualify for SSI under" listings 12.04 and 12.06. *Id.*

Because Dr. Burdge reviewed Dr. Cunningham's evaluation, the ALJ rejected Dr. Burdge's reviewing opinion for the same reasons he rejected Dr. Cunningham's opinion. He also referred to his prior analysis—determining that Ms. Hurn's mental impairments do not meet the

criteria of listings 12.04 and 12.06—to contradict Dr. Burdge's conclusion that those impairments would meet those listings. AR 20-21, 34-35. Ms. Hurn does not challenge that analysis.

Ms. Hurn contends only that "[t]he ALJ erred by improperly rejecting Dr. Burdge's opinion, which provides further support for Dr. Cunningham's opinion and Ms. Hurn's testimony." Dkt. 13, p. 10. This does not raise a substantive challenge to the ALJ's reasons for rejecting Dr. Burdge's opinions. *See Carmickle*, 533 F.3d at 1161 n.2. In addition, the ALJ's reasons are specific and legitimate, because Dr. Burdge relied entirely on Dr. Cunningham's opinion and, as discussed above, the ALJ gave specific and legitimate reasons to discount Dr. Cunningham's opinion.

4.    <u>Examining Psychologist Jason Prinster, Ph.D.</u>

Ms. Hurn contends that the ALJ also erred in rejecting Dr. Prinster's examining opinion.

Dr. Prinster completed a "psychological and parental competency evaluation" in June 2012. AR 1744. Dr. Prinster performed a clinical interview, a mental status exam, and several cognitive and emotional functioning tests, and he observed Ms. Hurn as she interacted with her child for an hour. *Id.* The purpose of the evaluation was to determine Ms. Hurn's ability to parent her child and to make recommendations that would enable her child to be returned to her. *See* AR 1758-63.

Dr. Prinster opined that, cognitively, Ms. Hurn has "[n]o significant deficits." AR 1758. He diagnosed that she has PTSD, for which she has received inadequate treatment, and pain disorder. *Id.* He noted that she showed symptoms of anxiety but that she can function when on medications. AR 1758-59. He found "more concerning" her dependence on opioids," which he found "significantly and negatively impacted her functioning." AR 1759. He found her to be

medication-focused. *Id.* He also noted that his observations of Ms. Hurn did not support

limitations from orthopedic pain. *Id.*

The ALJ assigned "some weight" to Dr. Prinster's opinion. AR 34. He noted that Dr.

Prinster did not assign Ms. Hurn specific limitations. Thus, he found "little probative value with

regard to a function-by-function analysis." *Id.* The ALJ stated that he "accounted for the

claimant's situational stressors," but he did "not find that additional limitations are warranted."

*Id.*

Ms. Hurn contends that the ALJ "erred by failing to acknowledge that Dr. Prinster's

clinical findings are consistent with Dr. Cunningham's opinion and with Ms. Hurn's testimony."

Dkt. 13, p. 9. Ms. Hurn does not identify a source of reversible error in the ALJ's discussion of

Dr. Prinster's opinions. Nor does she address the ALJ's reasoning. Ms. Hurn again fails to raise a

specific argument. *See Carmickle*, 533 F.3d at 1161 n.2.

Any error in giving too little weight to Dr. Prinster's opinion would be harmless, in any

case, because Dr. Prinster's observations about Ms. Hurn's cognitive functioning, lack of

physical limitations, ongoing substance abuse, and drug-seeking behavior actually support the

ALJ's conclusions regarding Dr. Cunningham's opinion and Ms. Hurn's testimony. *See Batson*,

359 F.3d at 1197.

    5.    <u>Examining Psychologist Benjamin Aleshire, Ph.D.</u>

Ms. Hurn also asserts that the ALJ erred in considering the opinion of an examining

psychologist, Dr. Aleshire.

Dr. Aleshire completed a psychological evaluation of Ms. Hurn in January 2013. He

reviewed her primary care records, conducted a clinical interview, and performed a mental status

exam. AR 1284-88. He listed diagnoses of major depressive disorder, PTSD, and "[o]pioid

dependence, in full-sustained remission, per claimant report," and he assessed her global assessment of functioning (GAF) score at 55-60. AR 1287. Dr. Aleshire opined that Ms. Hurn is moderately impaired in her mental health functioning due to depression and PTSD. In particular, he opined that those conditions would moderately limit Ms. Hurn's ability to complete a normal workday and workweek without interruption from her symptoms and her ability to deal with workplace stress. AR 1287-88. He otherwise found that Ms. Hurn is able to: perform one-or two-step simple and repetitive tasks; complete complex tasks; accept instructions and interact with coworkers and the public; work consistently without special instruction; and maintain regular attendance at work. AR 1288.

The ALJ credited all of Dr. Aleshire's opinions as to Ms. Hurn's limitations and stated that he accounted for them in Ms. Hurn's RFC. AR 33. He noted, however, that he discounted the portions of Dr. Aleshire's evaluation in which he diagnosed Ms. Hurn as being in sustained remission and assessed her GAF score. *Id.* The ALJ explained that Dr. Aleshire's opinions were discounted in this way because Ms. Hurn had misinformed Dr. Aleshire about her substance use. *Id.*; *see* AR 1285-86 ("She stated that she only used medications for six months during the end of her abusive relationship. She denied all other substance abuse.").

Ms. Hurn asserts that the RFC "does not fully account" for the limitations Dr. Aleshire describes.

Ms. Hurn again fails to present any reasoned argument to support her conclusion that the ALJ erred. *Carmickle*, 533 F.3d at 1161 n.2. A review of Dr. Aleshire's opinions supports the ALJ's finding in the RFC that Ms. Hurn is "capable of unskilled, simple, repetitive, and routine tasks," "frequent contact with co-workers for work tasks" with limited collaboration, and "occasional contact with the general public," and that she would be "off task up to 5% of the

eight hour workday." AR 21. Substantial evidence thus supports the ALJ's discussion of Dr. Aleshire's opinion.

6.     Treatment Notes by Kent T. Ta, M.D., and James Patrick Robinson, M.D.

Finally, Ms. Hurn contends that the ALJ erred in considering records made by two treating physicians—Dr. Ta and Dr. Robinson—who did not offer opinions on Ms. Hurn's limitations.

Dr. Ta, a rheumatologist, examined Ms. Hurn in December 2008 and March 2011 on referrals from Dr. Johnson. AR 617, 619. In 2008, he noted Ms. Hurn had "diffuse tender points, 12/18." AR 618. He found that the "rheumatologic exam today demonstrates only signs of fibromyalgia. I doubt if she has an underlying inflammatory connective tissue disease but we will screen for them nevertheless." *Id.* He listed fibromyalgia as a diagnosis. *Id.* He prescribed amitriptyline and vitamin D and asked Ms. Hurn to follow up with him in six weeks. *Id.*

Ms. Hurn did not see Dr. Ta again until the 2011 examination. AR 620. At that visit, Dr. Ta again found "12/18 tender points" and repeated his diagnosis of fibromyalgia. AR 620. He asked Ms. Hurn to see him again in two weeks. *Id.*

Dr. Robinson performed a "pain center consultation" with Ms. Hurn in March 2013. AR 1877. He found that Ms. Hurn "reports pain in at least 8 of the 18 sites" for a fibromyalgia diagnosis. AR 1879. He opined that "[a]lthough she does not quite meet American College of Rheumatology criteria for a diagnosis of fibromyalgia, it is likely that she has a fibromyalgia-like condition." *Id.* He found that based on the limited information available to him, he could not "rule out the possibility of some specific structural lesion in the cervical spine or lumbar spine that could account for some of her symptoms," but he found "that this is somewhat unlikely." *Id.* He noted he "did not see evidence of internal derangement" in Ms. Hurn's right knee, but that

she "does appear to have joint hypertrophy that is consistent with her report of degenerative arthritis." He observed that Ms. Hurn "appears to have very significant problems with anxiety and perhaps depression." *Id.* He recommended effective treatment for anxiety and depression, though he noted that "she is already receiving effective care in this area." AR 1880. He recommended a second orthopedic opinion on her knee and that she "work downward" on her opioid medications. *Id.*

As noted above, the ALJ found at step two that Ms. Hurn suffers from the severe physical impairments of "spine disorder, dysfunction of major joints, [and] obesity." AR 19. The ALJ discussed the diagnoses of fibromyalgia in the accompanying discussion:

> I note that the claimant's pain complaints have been assigned various diagnoses, including fibromyalgia/fibromyalgia-like and assessments that she does not have fibromyalgia. See e.g. [AR 1879]. I have considered these various diagnoses, but find that the impairments listed in the bolded finding best categorize the claimant's history as revealed in the medical evidence of record. Furthermore, the sequential disability analysis is not driven by diagnosis, but rather by functioning, and as discussed more thoroughly below, I have considered all of the claimant's established symptoms and resulting functional limitations – regardless of the diagnostic label attached to them – in assessing the claimant's maximum residual functional capacity.

AR 19.

The ALJ also discussed Dr. Ta's notes in the discussion accompanying his RFC assessment. AR 23. The ALJ noted that Dr. Ta's 2008 "work-up" "did not result in a definitive diagnosis for the claimant's pain." AR 23. He summarized Dr. Ta's findings at the 2011 exam, as well, noting that Dr. Ta "ordered imaging and instructed her to take ibuprofen or Tylenol."

Ms. Hurn contends that the ALJ "failed to acknowledge" Dr. Ta's findings and opinion and failed to apply Social Security Ruling 12-2p with respect to Ms. Hurn's fibromyalgia diagnosis. She further contends that the ALJ's mischaracterization of her fibromyalgia diagnosis undermines the ALJ's findings about her "relentless pursuit of medication."

The Commissioner issued Social Security Ruling (SSR) 12-2p in 2012. Recently, in *Revels v. Berryhill*, the Ninth Circuit discussed how to properly apply its precedent and SSR 12-2p in considering a claimant's symptom testimony. 874 F.3d 648, 662 (9th Cir. 2017). The Court observed that ALJs must construe medical evidence "in light of fibromyalgia's unique symptoms and diagnostic methods" when evaluating a claimant's disability. *Revels*, 874 F.3d at 662. The Court noted that fibromyalgia is unusual because a patient lacks "'symptoms that a lay person may ordinarily associate with joint and muscle pain,'" as the patient can show normal strength, sensation, and reflexes, as well as joints that appear normal. *Revels*, 874 F.3d at 656 (quoting *Rollins v. Massanari*, 261 F.3d 853, 863 (9th Cir. 2001) (Ferguson, J., dissenting)). The court noted that instead "[t]he condition is diagnosed 'entirely on the basis of the patients' reports of pain and other symptoms.'" *Revels*, 874 F.3d at 656 (quoting *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004)).

The Ninth Circuit held that the ALJ erred in assigning "no weight" to the opinion of a treating rheumatologist. *Revels*, 874 F.3d at 662-64. The claimant visited the doctor 12 times. *Id.* at 662. The doctor provided detailed treatment notes, a letter describing the claimant's fibromyalgia condition, findings, and treatment, and records documenting pain in multiple areas of the body and eleven or more tender points in five out of eight appointments. *Id.* at 663. To treat the claimant's fibromyalgia, the doctor had prescribed numerous medications and administered steroid injections. *Id.*

Here, the ALJ did not acknowledge that Dr. Ta actually stated a diagnosis of fibromyalgia or that Dr. Robinson found "she has a fibromyalgia-like condition." AR 23, 620, 1879. Any error in the ALJ's consideration of treatment notes from Dr. Ta or Dr. Robinson was harmless, however.

The ALJ's alleged error in failing to accurately characterize Dr. Ta's fibromyalgia diagnosis is distinguishable from the ALJ's prejudicial error in *Revels*. Most importantly, unlike in *Revels*, the record here contains no opinion evidence indicating that fibromyalgia had limiting effects beyond those in the RFC. *See Revels*, 874 F.3d at 657-59 (treating nurse practitioner, treating physician, and physical therapist opined that fibromyalgia had significantly limiting effects). Instead, the ALJ's discussion shows that he considered all the opinion evidence with respect to pain limitations, regardless of the condition that caused the limitations. AR 32-33.

Moreover, unlike the treating rheumatologist in *Revels*, Dr. Ta did not provide detailed treatment notes or a letter describing Ms. Hurn's condition, supporting findings, and treatment. *See* AR 618-20. This case is also distinguishable from the situation in *Revels,* because neither Dr. Ta's treatment notes, nor other treatment notes in the record, contain the amount of support for such a diagnosis that was present in *Revels*. *See* 874 F.3d at 657-59 (finding 11 or more tender points in five out of eight appointments).

Unlike the claimant in *Revels*, Ms. Hurn points to no record that she was treated for fibromyalgia, with medications, steroid injections, or any other methods apart from over-the-counter pain relievers. *Compare Revels*, 874 F.3d at 658, 663-64 ("[T]he record demonstrates that after each of his appointments with Revels, Dr. Nolan provided a detailed account of the visit, including Revels' complaints of pain, the effectiveness of the prescribed medication or injections, and his findings on the current state of her fibromyalgia."). Instead, after Dr. Ta noted "signs of fibromyalgia" in December 2008, he recommended Ms. Hurn follow up with him in six weeks. AR 618.

She did not visit him again for over two years, and apparently did not return after that. AR 619. In addition, Ms. Hurn's primary-care provider, Dr. Johnson, repeatedly referred Ms.

Hurn to the pain clinic in lieu of prescribing more medication. *See* AR 1352, 1356, 1361, 1382, 1932. When Ms. Hurn was evaluated there in April 2012, ARNP Sylvia Little thoroughly examined her and concluded, "I do not think [Ms. Hurn] has fibromyalgia." AR 688. The ALJ considered both Dr. Ta's notes and ARNP Little's examination in his RFC discussion. AR 23, 25.

Finally, With respect to Dr. Robinson's treatment notes, Ms. Hurn contends only that the ALJ "erred by failing to acknowledge that Dr. Robinson's clinical findings are consistent with the other medical evidence, and they support Ms. Hurn's testimony." Dkt. 13, p. 10. An ALJ's failure to acknowledge a claimant's preferred interpretation of items in the treatment record is not reversible error. *See Morgan*, 169 F.3d at 601 ("[W]hen evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld."). Accordingly, Ms. Hurn identifies no error with respect to either Dr. Ta's or Dr. Robinson's notes.

C.     The ALJ's Assessment of Plaintiff's Subjective Testimony

Ms. Hurn contends that the ALJ erred in discounting her subjective testimony.

Questions of credibility are solely within the control of the ALJ. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. *Allen v. Heckler*, 749 F.2d 577, 580 (9th Cir. 1984). In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. *See id.* at 579. Even if the reasons for discrediting a claimant's testimony are properly discounted, that does not render the ALJ's determination invalid as long as the determination is supported by substantial evidence. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

When gauging a plaintiff's credibility, an ALJ must engage in a two-step process. First, the ALJ must determine whether there is objective medical evidence of an underlying

impairment that could reasonably be expected to produce some degree of the alleged symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996). If the first step is satisfied, and provided there is no evidence of malingering, the second step allows the ALJ to reject the claimant's testimony of the severity of symptoms if the ALJ can provide specific findings and clear and convincing reasons for rejecting the claimant's testimony. *Id.* To reject a claimant's subjective testimony, the ALJ must provide "specific, cogent reasons for the disbelief." *Lester*, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*; *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

Ms. Hurn testified that she cannot work due to sleep problems, foot pain and numbness, a severe skin condition, back pain, and "emotional issues." She stated that she sometimes is up all night trying to sleep. AR 88-89. She testified the outsides of her feet are numb while she has burning pain on the inside. AR 91. She testified that his makes it difficult to walk far and makes her "shift" and "scuffle" when she walks. *Id.* She stated she received prescription pain medication for her feet. *Id.*

Ms. Hurn testified that body pain makes it difficult to focus on anything else. AR 90. She stated that pain makes her shake and her knees buckle so that she needs to hold onto something. AR 92. She stated that this happens when she moves too much and that it happens often; on the previous day, it happened after organizing her things, making her bed, doing dishes, and going up and down stairs, so that she had to lie down afterward. AR 92-93. She testified that she needs to lie down at least three times per day, for 20 minutes to an hour. AR 94-95.

Ms. Hurn testified that she had described her pain symptoms to a doctor "and he said that sounded like fibromyalgia." AR 95. She said that she had full-body pain every day and that it

was worse in winter. AR 95-96. She described the pain she feels when her back is rubbed or her hand grabbed. AR 95.

Ms. Hurn also testified that her physical impairments lead to emotional problems because they make her frustrated. AR 96. She stated: "It takes everything just to get up and look somewhat normal or act somewhat normal or just do the very littlest things in a house that should not even count for anything." AR 96-97. She stated that this depressed feeling affected her daily activities and ability to socialize. AR 97.

Ms. Hurn also testified that she experiences physical effects of anxiety, feeling her chest get heavy and her ears ring, and that she hyperventilates. AR 98. She testified that she had gone to the hospital during such episodes because her heart hurt. AR 98. She also stated that she had a panic attack the previous week, and that such attacks last from 15 minutes to an hour. AR 99. Ms. Hurn said that she also had PTSD from domestic abuse in a prior marriage and from being in two car accidents. AR 99-100.

The ALJ discounted this testimony for three main reasons. Ms. Hurn contends that these were not clear and convincing reasons to reject her testimony. The Court considers these reasons in turn.

1.  <u>Lack of Objective Medical Evidence</u>

First, the ALJ found that Ms. Hurn's "longitudinal treatment history is inconsistent with the extent of her alleged physical symptoms and limitations." AR 23. He noted that Ms. Hurn's examinations "were generally normal" and her imaging results were "also inconsistent with the extent of [her] allegations." *Id.*

Ms. Hurn contends that the ALJ's failure "to properly evaluate all of Ms. Hurn's medical evidence . . . tainted his evaluation of Ms. Hurn's testimony." Dkt. 13, p. 11. She also contends that in finding the treatment history inconsistent with her reported symptoms and limitations, the

ALJ failed to acknowledge her fibromyalgia diagnosis. See AR 23, 618. She notes that such results would not be inconsistent with fibromyalgia. And she points to the results of two tender-point exams in her visits to Dr. Ta—results that she contends are "corroborating objective medical evidence" contrary to the ALJ's finding.

An ALJ may not rely solely on a lack of objective medical evidence to reject a claimant's subjective symptom testimony. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir.2001). But "the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Id.*; SSR 96-7p (superseded by SSR 16-3p, after the ALJ decision in this case).

Here, the ALJ accurately observed that Dr. Johnson's and ARNP Coulter's clinical observations did not show abnormalities. AR 23; AR 539 (noting smooth gait, full strength, and grossly intact sensation), 545 (noting limited flexion and extension and some difficulty toe walking but normal lateral bending), 547 (x-rays did not show significant abnormalities), 798, 813. Nor did imaging of Ms. Hurn's cervical and lumbar spine. AR 622, 624.

Ms. Hurn is correct that the regulations require the ALJ to give careful consideration to the longitudinal record when a claimant has established a fibromyalgia diagnosis. *Revels*, 874 F.3d at 657; SSR 12-2p. ALJs must construe the evidence "in light of fibromyalgia's unique symptoms and diagnostic methods" when evaluating a claimant's disability. *Revels*, 874 F.3d at 662. In particular, the Ninth Circuit has recognized that fibromyalgia is diagnosed primarily based on the patient's self-reported symptoms. *Id.* at 656. Ms. Hurn asserts that the ALJ failed to properly interpret Dr. Ta's diagnosis of fibromyalgia and corroborating tender-point findings.

Ms. Hurn again cites—but does not discuss—the Ninth Circuit's opinion in *Revels*, which held that the ALJ failed to properly account for evidence regarding the claimant's fibromyalgia in weighing her testimony. 874 F.3d at 666-68. *Revels* is distinguishable:

First, in reviewing the claimant's longitudinal treatment history, the court in *Revels* observed that "the medical records largely pertain to Revels' fibromyalgia, as do the assessments concerning her limited functional ability." 874 F.3d at 656. In contrast, fibromyalgia plays a minor role in Ms. Hurn's treatment records. At almost all of her visits, her treating providers, Dr. Johnson and ARNP Coulter, did not list the condition among her diagnoses or prescribe treatment for it, despite having received Dr. Ta's notes. *See generally* AR 537-683 (treatment records, February 2008 to March 2012); AR 1644-1742 (November 2011 to October 2012); AR 1348-83 (January 2014 to June 2014); AR 1896-1942 (July 2014 to February 2015); AR 1967-88 (March to July 2015). At the few visits where fibromyalgia was listed among Ms. Hurn's conditions, her providers recommended only ibuprofen as needed. AR 773, 778.

Dr. Ta is apparently the only provider who diagnosed fibromyalgia, and Ms. Hurn did not return to him for the follow-up he requested; she went back to him only once, two years later. AR 618-19. Apart from again asking Ms. Hurn to follow up with him, Dr. Ta recommended only ibuprofen or Tylenol as treatment. AR 620.

Second, in *Revels* the Ninth Circuit rejected the ALJ's reasoning that the claimant's testimony was undercut by a lack of "objective findings," like x-rays and MRIs— and noted that instead "fibromyalgia is diagnosed, in part, by evidence showing that another condition does not account for a patient's symptoms." 874 F.3d at 666 (citing SSR 12-2p at *3). In the instant case, unlike the situation in *Revels*, there is no indication that Dr. Ta eliminated other conditions or addressed any of the other criteria for a fibromyalgia diagnosis under the Commissioner's ruling.

*See* SSR 12-2p at *2-3 (requiring diagnosing physician to show "[a] history of widespread pain," "[r]epeated manifestations of six or more FM symptoms, signs, or co-occurring conditions," and "[e]vidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded").

Finally, the court in *Revels* also rejected the ALJ's finding that the claimant's "conservative" treatment undercut her testimony, because that finding was not supported by the record; in addition to pain medications, the claimant "received facet and epidural injections in her neck and back, as well as steroid injections in her hands." 874 F.3d at 667. The court in *Revels* noted that the ALJ did not explain how this was "conservative" treatment for fibromyalgia, contrasting it to the treatment the court found conservative in a prior case. *Id.* (citing *Rollins v. Massanari*, 261 F.3d 853 (9th Cir. 2001)).

Here, as discussed above, the ALJ correctly found that Ms. Hurn did not follow the treatment recommended for her pain, whether it was from fibromyalgia or another condition. For fibromyalgia specifically, Ms. Hurn's providers prescribed only ibuprofen and Tylenol. AR 620, 773, 778. This treatment does not resemble the treatment the claimant received in *Revels*.

Thus, the ALJ did not err in considering the objective evidence while weighing Ms. Hurn's testimony. To the extent Ms. Hurn relies on Dr. Ta's notes to assert that the ALJ did not properly consider evidence of fibromyalgia, that argument is unavailing: no doctor opined that fibromyalgia limited Ms. Hurn's functioning, and the extensive treatment record does not show any fibromyalgia treatment other than over-the-counter pain relievers.

2.  Drug Seeking and Failure to Pursue Other Treatment

In addition to finding little objective medical support for Ms. Hurn's stated symptoms, the ALJ found that "the record is rife with examples of the claimant's persistent pursuit of medication." AR 23. The ALJ thoroughly reviewed this history, AR 23-30: Various providers

expressed concerns similar to Dr. Robinson's, in 2014, that Ms. Hurn's opioid prescriptions were "substantially above recommendations of the Agency Medical Directors' Group." AR 1879; *see* AR 1267, 1308, 1759.

Ms. Hurn doubled her use of pain medication without permission from Dr. Johnson, AR 1146 (July 2008), and increased the dosage on her own at various other points. *See, e.g.*, AR 1267 (September 2006); AR 853 (September 2007); AR 601 (March 2009). Ms. Hurn's treatment notes support the ALJ's finding that she "was frequently out of medication early" and "requested early prescription refills at the majority of her appointments." *See, e.g.*, AR 539, 562, 564, 566, 586, 599, 790, 801, 811, 1079, 1302, 1308, 1313, 1365, 1512, 1695, 1722, 1767, 1896, 1977 (treatment notes from July 2008 to April 2015); *see also* AR 1759 (Dr. Prinster found dependence on opioids "more concerning" than other mental health issues).

Ms. Hurn's providers noted signs of addiction or withdrawal. AR 775, 1308 (treating ARNP Coulter found that Ms. Hurn was likely dependent on benzodiazepines), 1533, 1973, 2044 (May 2015 hospitalization for acute metabolic encephalopathy related to medication use ("polypharmacy")). Ms. Hurn's providers noted other complications related to medications: medications reported lost or stolen, AR 590, 1913; and presentation to emergency department seeking medication, even after establishing care with Dr. Johnson and sometimes in the same week she saw him. AR 538 (2/13/08 Dr. Johnson visit), 1170 (3/4/08 Emergency Department (ED) visit), 1180 (3/7/08 ED visit); 1069 (2/22/12 ED visit), 1039 & 1464 (12/31/12 ED for knee pain), 1138 (8/4/08 ED for knee pain), 1146 (ED for pain, 7/13/08), 1182 (ED 2/5/08), 1192 (ED 1/19/08); 1562 (ED for pain, 10/24/13).

1    From this record, the ALJ inferred that Ms. Hurn's "history of medication misuse

2    undermines [her] allegations of symptoms." AR 27. This was a reasonable inference based on the

3    totality of the medical record. *Sample*, 694 F.2d at 642.

4    Ms. Hurn contends that the ALJ "selectively summarize[d] the medical evidence" to

5    reach the conclusion that it shows "misuse and possible dependence" on pain medications. Dkt.

6    13, p. 12; AR 24-27. She further asserts that in any case "the fact that Ms. Hurn developed

7    dependence on pain medications is not a convincing reason to reject her testimony about the pain

8    she has been experiencing." Dkt. 13, p. 12. Relatedly, she contends that her hospitalization for

9    acute respiratory failure due to misuse of an old medication is not relevant. *Id.*; *see* AR 1973,

10   2044.

11   An ALJ may not engage in "wide-ranging scrutiny of the claimant's character and

12   apparent truthfulness" to discount the claimant's testimony. *Trevizo*, 871 F.3d at 678 n.5. Here,

13   however, the ALJ did not reject Ms. Hurn's testimony because she had developed a dependence

14   on pain medication. Rather, he discounted Ms. Hurn's statements about the severity of her

15   symptoms because he found that the record showed she tended to exaggerate those symptoms as

16   a means to obtain prescription medication. This is a clear and convincing reason to discount that

17   testimony. *See Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (holding that ALJ's

18   finding that claimant exaggerated symptoms to obtain prescription medication is valid reason to

19   reject treating doctor's opinion where doctor was unaware of exaggeration). The record

20   described above supports that finding.

21   Importantly, the ALJ found that Ms. Hurn not only pursued medication, but did so to the

22   exclusion of other recommended treatment. AR 24 (finding Ms. Hurn "failed to pursue other

23   recommended treatment options" and this "reflects poorly on the claimant's credibility"). In

24

25

response, Ms. Hurn contends only that her "fail[ure] to pursue other recommended treatment options" happened as the result of "limited insight into her impairments." Dkt. 13, pp. 12-13. Ms. Hurn cites no evidence in the record to support this assertion, and none is apparent.

An unexplained, or inadequately explained, failure to seek treatment may lead to an adverse credibility finding. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). The record contains substantial evidence for the ALJ's finding: With respect to her reported insomnia, the record shows only that she used medications and does not indicate that she visited a sleep clinic as Dr. Johnson recommended. AR 551, 573, 593, 598, 1374, 1879; *see* AR 690 (pain clinician recommended discontinuing Ambien, as possible cause of insomnia). For her pain, Dr. Robinson, at the UW Pain Center, noted in 2013 that she had not had "nonpharmacologic therapy" in 12 years. AR 1878. When Ms. Hurn visited the pain center, ARNP Little "STRONGLY recommend[ed] yoga and/or Tai Chi as part of a multi-modal strategy for treating chronic pain," but there is no indication that Ms. Hurn pursued such a strategy on a sustained basis. Dr. Johnson and ARNP Christina Coulter—Ms. Hurn's primary care providers and pain managers—repeatedly referred her back to the pain center, but she did not return there. *See* AR 1352, 1356, 1361, 1382, 1932.

3. Activities

Finally, the ALJ found that Ms. Hurn's activities undermine her testimony. The ALJ noted that Ms. Hurn reported "doing a fair amount of walking" in September 2008 and walking three-quarters of a mile every day in early 2009. *See* AR 601, 609. The ALJ also found Ms. Hurn's testimony that she was socially isolated from anxiety to be inconsistent with her ability to take three trips, including one in June 2015 that lasted almost a month. *See* AR 1360, 1970. And the ALJ noted that in 2013 Ms. Hurn had reported doing "some work under the table" since 2006. He found that this undermined her claim of disability. Likewise, the ALJ found that Ms.

Hurn's testimony that she was nearly agoraphobic was contradicted by her friend's report that she shopped four or five times per month, for three to four hours, and went to church and her children's sporting events. AR 460-61.

Ms. Hurn asserts that "her overall activities are consistent with her testimony" and "none of her activities are transferable to competitive work skills." Dkt. 13, p. 13.

The ALJ determined that there was a disparity between the severity of symptoms alleged by Ms. Hurn and the level of activity that she participated in. *Compare Revels,* 874 F.3d at 667-68 (holding ALJ erred in finding "'wide disparity'" between claimant's testimony and her activities, which included grooming, household chores, and some childcare tasks). In the instant case, the ALJ cited several specific activities as being inconsistent with specific complaints made by Ms. Hurn. As discussed above, the record supports that finding of inconsistency. This was a valid consideration in the ALJ's decision to discount Ms. Hurn's testimony. *See Trevizo*, 871 F.3d at 682 (ALJ may reject claimant's testimony about symptoms based on evidence of activities inconsistent with claimant's testimony about the severity of those symptoms).

D.    The ALJ's Assessment of Lay Witness Testimony

Ms. Hurn also contends that the ALJ erred in rejecting lay-witness testimony about her impairments.

The record includes brief letters from three of Ms. Hurn's friends: Deborah White, Tamara Reddeman, and Tanya Howard, AR 512, 514, 517, and a third-party function report from Ms. White, AR 457-64. Ms. Reddeman wrote that Ms. Hurn has trouble walking due to her back and leg pain; that she loses her train of thought while talking; that she suffers from periods of depression in which she stays at home; and she has pain that makes her stay in bed for days. AR 512. Ms. Howard wrote that Ms. Hurn has trouble completing projects and tasks; that she cancels trips to the store because of her pain; and has trouble sitting at times due to pain, needing to

change positions. AR 514. Ms. White added that Ms. Hurn falls a lot because she cannot feel her feet; that she has problems with her attention span; and that her memory got worse after her emergency room visit when she was in a "coma." AR 517. In a function report, Ms. White indicated Ms. Hurn could not be on her feet for more than four hours due to back and knee pain; that PTSD and anxiety attacks affect her ability to handle stress; and otherwise, it indicated a higher level of functioning than did the letters or Ms. Hurn's testimony. AR 457-64.

The ALJ found that these observations "are similar to the claimant's own subjective complaints of disabling symptoms, including prolonged standing, difficulty maintaining attention, remembering, depression with isolative tendencies, difficulty with task completion, etc." AR 32. He therefore gave them "little weight for the same reasons" that he discounted Ms. Hurn's testimony. *Id.* He recounted those reasons: "her longitudinal treatment history, the lack of objective clinical findings, her performance on physical and mental examinations, her lack of pursuit of all treatment options, her lack of timely follow up, her persistent pursuit of narcotics and benzodiazepines, and her independent daily activities." *Id.*

Because Ms. Reddeman, Ms. Howard, and Ms. White's statements were similar to plaintiff's testimony, the ALJ's valid reasons for discounting Ms. Hurn's statements also provided germane reasons to discount the lay testimony. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting [claimant's] own subjective complaints, and because [layperson's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony."); *see also Fry v. Berryhill*, 2017 WL 3149890, at *5 (E.D. Cal. July 25, 2017).

Ms. Hurn also alleges that the ALJ erred in not discussing an observation by a Social Security Administration interviewer that Ms. Hurn "continuous[ly] spoke about issues that did not pertain to her disability," and that "[m]ental health appears to be a significant issue." AR 436. The ALJ, however, determined that Ms. Hurn had severe mental health impairments. AR 19. Because the interviewer's comments were not inconsistent with the ALJ's findings, and the ALJ thus did not reject them, the ALJ was not required to discuss those comments. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010).

E.     RFC Assessment and Step-Five Finding

Finally, Ms. Hurn contends that the RFC did not contain limitations shown by the medical opinion evidence, treatment record, her testimony, and lay-witness testimony. She asserts that because the RFC was incomplete, the ALJ's step-five finding—that she can perform jobs existing in significant numbers in the national economy—is also erroneous. However, because the Court concludes that the ALJ did not err as alleged, the Court holds that the RFC was complete and the step-five finding is legally valid.

## CONCLUSION

Based on the foregoing discussion, the undersigned finds no error in the ALJ's determination that plaintiff was not disabled. Defendant's decision to deny benefits is therefore AFFIRMED.

Dated this 23rd day of August, 2018.


*Theresa L. Fricke*
Theresa L. Fricke
United States Magistrate Judge